[PHILADELPHIA, APRIL 17th, 1837.]

## HOFFMAN *against* COSTER and Others.

### IN ERROR.

2 wh 453
145   306
2 wh 453
169   322
Whart.
2 wh 453
199   249

2 Wh 453
f  19 SC ²595

2 Wh 453
25 SC    59
e  26 SC ²215

1. A pardon by the President of the United States, reciting that J. B. was convicted at a Circuit Court of the United States, of passing a counterfeit bank note, and sentenced to three years' imprisonment, and concluding, "I do hereby remit unto him, the said J. B. the remainder of the said sentence, and order him to be liberated from further imprisonment, on payment of the costs," was *held* to restore the competency of J. B. as a witness.

2. In ejectment by a person claiming under a deed from *Nathaniel* S., who was alleged to have purchased the premises at a sheriff's sale, it was *held* that parol evidence was not admissible to show, that the acknowledgment by the sheriff was originally of a deed to *Nathaniel* S., and that afterwards the prothonotary's clerk, at the instance of *Charles* S. and by collusion with him, erased the name of *Nathaniel* S., and substituted that of *Charles* S.; the defendant claiming by deed from Charles S.

THIS was a writ of error to the Court of Common Pleas of the county of Northampton, to remove the record of an action of ejectment which, under the provisions of a special act of assembly, had been removed from the Court of Common Pleas of Schuylkill county.

The action was brought by Jacob Hoffman against John G. Coster, trustee, and John G. Coster, Henry M. Vansellenger and Joseph Jacques, who survived John Hone and Augustus H. Lawrence, trustees, to recover 21,649 acres and 133 perches of land, situate in Schuylkill county.

At the trial which took place on the 20th of September 1836, the plaintiff having produced warrants and surveys for the land in question, and deeds-poll from the warrantees to John Nicholson, gave in evidence a mortgage, dated the 22d of January 1795, from John Nicholson to Isaac Snowden, for securing payment of a bond in the penal sum of $65,229 06, conditioned for the payment of $32,614 53 on the 4th of April 1801, with interest payable half yearly, granting sixty adjoining tracts, containing 25,000 acres on Bushkill in the county of Northampton, and also granting 50 contiguous tracts of land, on the head waters of Schuylkill in Berks county, containing together 21,649 acres and 133 perches, being the lands in question, and the same referred to in the warrants, surveys, and deeds-poll. Also, the record of a judgment in the

(Hoffman *v.* Coster.)

Common Pleas of Berks county, of the term of November 1809, No. 93, at the suit of Isaac Snowden, to the use of Nathaniel R. Snowden, against Hannah Nicholson and others, heirs of John Nicholson, deceased, defendants; with a *levari facias* to August term 1810, No. 54, endorsed " Debt $65,229 06 : property sold : so answers Geo. Marx, Sheriff."

The plaintiffs then called Alexander H. Witman, who testified as follows :—" I am the prothonotary of Berks county. This is one of the books of my office ; the docket wherein the sheriff's deeds are recorded. It commences the 14th of August 1789, and ends April 16th, 1814."

The plaintiff then offered in evidence the record of an acknowledgment of a sheriff's deed, by George Marx, Sheriff, dated 9th August 1810, (alleging the said record to have originally been of the acknowledgment of a deed to Nathaniel R. Snowden, and that the name " *Nathaniel R.*" had been fraudulently erased from the said record, and the name " *Charles*" fraudulently substituted therefor,) in connexion with evidence to show the existence of the deed to Nathaniel R. Snowden, its due execution and acknowledgment, and its loss; which being objected to by the defendants, was admitted by the court ; the defendants excepting to the decision.

The entry of the acknowledgment of the deed on record was as follows :

" Isaac Snowden for the use of
   Nathaniel R. Snowden              *Levari Facias* tested
          *v.*                       at Reading April 14,
   John Nicholson's heirs             1810.

And now to wit: August 9, 1810—
George Marx Esquire, High Sheriff of Berks county, produced to the Court a deed, dated the day and year aforesaid, under his hand and seal duly executed, to *Charles* Snowden for fifty contiguous tracts of land situate on the head waters of Schuylkill, partly in Manheim and partly in Pinegrove township, Berks county, containing together twenty one thousand six hundred and forty-nine acres, one hundred and thirty-three perches, and the allowance of six per cent. for roads, &c. more or less, adjoining lands of Thomas Reed, Jacob Graul, Michael Gunkle, Francis Umbehacker, John Wagener, Robert Martin, Esquire, and others, *which the said sheriff sold to the said Nathaniel,* as the estate late of John Nicholson, deceased, by virtue of a writ of *levari facias* to him directed : which said deed the said George Marx, Esquire, High Sheriff as aforesaid, acknowledged as and for his act and deed and desired that the same might be recorded as such according to law.

Entered on record August 14, 1810.—Examined by me."

(Hoffman *v.* Coster.)

The plaintiff then having proved the death of a certain Jacob K. Boyer, offered in evidence the testimony of the said Boyer, as delivered before arbitrators on a former trial of this cause; to be read from the notes of the counsel duly proved.* To the admission of which the defendants objected.

---

* The testimony of Boyer, as taken before the arbitrators, was as follows:—

" In the early part of the summer of 1810, there was a sheriff's sale of the property of John Nicholson, deceased, at the house of Elizabeth Wood, in the borough of Reading. The property consisted of a number of tracts of unimproved lands, then in Berks and now in Schuylkill county. William Whitman, jr. and myself, attended the sale with the intention of purchasing it. When we came to the place, Major Charles Snowden was there attending to the sale. He stated there, that if there were bidders there, the property would be bid up to the amount of the mortgage. That being a much greater sum than Mr. Whitman and myself intended to pay for it, we declined giving a bid. Major Snowden then bid $100. The property was cried a long time, and no other bid being given, the property was knocked down to him. He said he was buying the property for his brother Nathaniel R. Snowden. That he was a poor preacher, and did not understand any thing about business; that he wished to do the best for him he could; to buy it for as small a sum as he could, in order to save poundage and costs. George Marx was then the sheriff of Berks county—lived the second door from me in Reading. He made out a deed to Nathaniel R Snowden for this land. I saw it and had it in my hands. I still had a view to purchasing it, and was interested to see how the title went. I saw the deed before and after it was acknowledged in court. I was under the impression that the title was in Nathaniel R. Snowden, until 1813. The deed which I saw, was a printed paper deed. I kept a store in Reading from 1810 to 1813. I saw the signature of the prothonotary and the seal of office to it—thus I knew it was acknowledged in court. Being frequently in the habit of purchasing property at sheriff's sale, and having sheriff's deeds, I know the manner in which the business was done. I thus knew it was recorded in the prothonotary's office." *Cross examined.* " On the back of the deed it was endorsed 'George Marx, sheriff, to Nathaniel R. Snowden.' I do not recollect whether the number of the tracts was marked on the back or not. The signature of the prothonotary and seal of the court, was at the foot of the deed, on the inside. I saw it in the sheriff's office before it was acknowledged. I looked over the deed hastily—merely read it to see that the deed was made to Nathaniel R. Snowden. I was a near neighbour of the sheriff's, and having a view to purchase, and desiring to see how the title went, I went there to see the deed. I went to the sheriff to ask him to whom the deed was made, and he showed it to me. It might have been as much as three weeks before the court. I saw it again in the sheriff's office after it was acknowledged. It was a two week's court. It was in the latter part of the second week or the week following, I think. I asked the sheriff to show it me. I had still a view to purchasing, and wanted to know if it was acknowleged. I do not know that I read it then. I just saw the acknowledgment on it. I know it was recorded, by seeing the seal of the court and the signature of the prothonotary to it. I saw the record of the deed, but long after that. It was previous to the sale of the property by the sheriff of Schuylkill county, as the estate of Major Charles Snowden. I saw the record in the prothonotary's office, in the county of Berks. There was an erasure on it, when I saw it." *Question.* " Was the property reputed to belong to Charles Snowden :" *Answer.* " It was to be sold as his property, and I wanted to see how the title stood. I do not know that I ever saw a deed from sheriff Marx to Charles Snowden. I do not know that I ever saw any other title papers except the mortgage under which it was sold, and the deed to Nathaniel R. Snowden. I saw the record of the mortgage—not the original. I do not know that I examined the records of any other papers. I attended the sale by the sheriff of Schuylkill county. In 1813, I first heard that this was the property of Charles Snowden. I might have head it before, but I will state the reasons for stating that time. From 1810 to 1813, I kept a store, and Major Snowden became in my debt. He frequently offered me some of those lands. We (Charles Snowden and I,) made an agreement for a moiety of 48 tracts of those lands. Previous to reducing the agreement to writing, I asked Major Snowden in what capacity he was selling, knowing the fact of the title being in Nathaniel R. He

(Hoffman *v.* Coster.)

1. That the said Jacob K. Boyer was not a competent witness; he having been convicted at May term 1829, in the Circuit Court of the United States for the Eastern District of Pennsylvania, of uttering and delivering a counterfeit one hundred dollar note of the United States Bank ; as appeared by the record of the conviction.

2. That the subject-matter of the said testimony was not evidence.

The plaintiff then gave in evidence a pardon from the President of the United States to the said Jacob K. Boyer, dated 1st April, 1831, as follows:

"ANDREW JACKSON, President of the United States of America.

To all to whom these presents shall come, greeting—

Whereas, a certain Jacob K. Boyer was convicted at April term, 1829, of the Circuit Court of the United States for the Eastern District of Pennsylvania, of passing a counterfeit hundred dollar note, purporting to be of the Bank of the United States, and sentenced to three years' imprisonment.

And whereas the said Boyer has been recommended as a fit subject for the exercise of the clemency of the Executive, by the whole jury who convicted him, and by a number of his highly

told me he had the deed. He had satisfied the sheriff, and he was to give his brother Nathaniel two tracts of land, a certain sum of money, and some other matters, what they were, I do not recollect. We then entered into the agreement. He stipulated to make me a good title. I was to have given him certain real estate in Northumberland, Union and Schuylkill counties, in part pay for the moiety—and make an advance of $6,000 on the other moiety. I did not ask him at that time, what had become of the deed, for he stipulated to make me a good title The matter was to be performed at some future day. I made no inquiry of sheriff Marx, because the Major did not comply with the contract. He negotiated a loan from another person, from Lewis Rees, Thomas Mills, and Samuel Wood. I complied with my part of the agreement—made the titles and tendered the money. The Major did not comply, and I brought suit. I recovered about what paid my expenses, &c. Something like $60. I made the inquiry previous to the sheriff's sale, relative to the erasure. After 1813, Snowden became indebted to me. I purchased in Rees, Mills and Wood's mortgage and other claims, and finding myself in rather a critical situation, I examined some time before the sheriff's sale—I think in 1817. When I discovered that, I called on Mr. Tilton, who at the time was clerk in the prothonotary's office. I inquired of him how the erasures came there. I think the mortgage to Rees, was originally $5000. There was interest on it when I got it. Marx was not sheriff any more then. I did not go to him." *Re-examined.* "I do not recollect that at the time he said that he had satisfied the sheriff, that he said any thing about an arrangement with the prothonotary. He told me that he had got the prothonotary's clerk, Mr. Tilton, to fix the matter on record for him. This was at the time I was negotiating with him for the sale of the moiety. At this time I had never seen the record. This was in 1813. It was previously to the sale in 1816 or 1817, that I saw the record." *Question.* "When you inquired of Tilton how the erasure came to be made, what did he say to you ?" *Answer.* "I asked Tilton how the erasure came to be made. He did not deny the erasure, and the writing of *Charles* in the room of *Nathaniel R.* He said that it was at the request of Charles Snowden, that he had done it. With that information, I came on to Schuylkill county, to attend the sale in Schuylkill county. He said on a former occasion, he had done some writing for Major Snowden, for which he had got more than the writing of fifty deeds would amount to. It was either $8000 or $10,000, that Mr. Witman and I intended to bid, in 1810, at the sheriff's sale."

respectable fellow-citizens; and moreover, it has been represented to me, that there were strong mitigating circumstances which he was unable to produce on his trial, owing to the absence of the witnesses who would have testified to them:

Now, therefore, I Andrew Jackson, President of the United States of America, in consideration of the premises, divers other good and sufficient reasons me thereunto moving, do hereby remit unto him, the said Jacob K. Boyer, the remainder of the said sentence, and order him to be liberated from further imprisonment, on payment of the costs.

[ L. s. ] In testimony whereof I have hereunto subscribed my name, and caused the seal of the United States to be affixed to these presents. Given at the City of Washington, this first day of April, A. D. 1831, and of the Independence of the United States the fifty-fifth.

By the President, ANDREW JACKSON.

M. VAN BUREN, Secretary of State."

After argument, the Court (BANKS, President) decided that the subject-matter of the said testimony was evidence, but rejected the testimony on the ground that the pardon was not sufficient to restore the competency of the witness; to which decision of the court, the plaintiff, by his counsel, excepted.

The plaintiff then again called Alexander H. Witman, who, upon looking at a paper produced, purporting to be the conditions of sale of the real estate late of John Nicholson, deceased, said—" The signature ' Wm. Witman, Jr.' subscribed as a witness" (to the cancelled acknowledgment of purchase under the said condition) " I believe to be the hand-writing of my father William Witman, Jr. who is deceased. I have often seen him write, and am well acquainted with his hand-writing."

The plaintiff then called Anthony F. Miller, who, being sworn, testified—" I found this paper" (referring to the said conditions of sale) " five or six years ago in the Prothonotary's Office at Reading. I think I found it in the bundle of executions to April or November term 1810. I never found but two or three other conditions in the office: I found them accidentally: I made search for this. It was in the state it is now when I found it—the name was cut off. I was clerk eight years and some months in the Prothonotary's Office at Reading. I came into the office in January 1827, and continued till March 1835. The entry of the sheriff's deed" (referring to the docket identified by Alexander H. Witman) " is in the hand-writing of William Tilton. Mr. Tilton was a clerk of the prothonotary. The word " Charles," written on the erasure, I would take to be in the hand-writing of William Tilton—the whole entry—the ink

(Hoffman *v.* Coster.)

in which "Charles" is written is not so dark as the other. I made the search for the conditions of sale at the request of Mr. Hoffman." *Cross-examined.*—" No person was with me helping me to make the search. I had made out several records, before the time I found it for Mr. Hoffman. If the conditions had been in the *levari facias,* I should have found it when I made the previous searches; but it was not. It was not with any paper that had any relation to this cause. I think there were some gentlemen searching for papers on behalf of Livingston or the heirs of Nicholson—there was frequent inquiry made. The gentlemen from Orwigsburg frequently examined, and it occurs to me there was an examination on behalf of Livingston or Nicholson. I gave the paper to Mr. Hoffman after I found it. I took it up to his office, and I think his receipt is in the Prothonotary's office. I did not consider it part of the record. I have not had it since. I saw it but once since I gave it to him, which was at Orwigsburg. I should judge the name was cut off from its appearance. I found it in 1830, 1831, or 1832. I should judge that no more has been cut off since I gave it, looking at the remainder of the letters on it. It is in the same state as when I got it. I never saw the paper till I found it that time. I do not know who put it into the office, nor when it was put in. The bundle in which I found it was otherwise in order. The writs are put up according to their term and number. It was in a writ to April or November, but not in any one having any connexion with it. No person told me where I should look. I first examined the bundles of writs to August, to which the writ was returnable; but, not finding it, I took up the bundle of April or November. I think General Adams was the prothonotary when I found the conditions. I had no authority from him to deliver this paper to Mr. Hoffman, but I think I mentioned it to him afterwards. I had no authority from the court. I called no witness to examine the state and condition of that paper before delivering it to Mr. Hoffman, nor did I afterwards. I may have mentioned it to some of my acquaintances, but I cannot say who. I named it to the prothonotary, either General Adams or Mr. Solliday. I was clerk under both of them. I think before I delivered this paper to Mr. Hoffman, I made a correct copy of it. I have it at home. I looked at home for it, but could not find it. I think I had the copy with me at Orwigsburg, although the circumstance was not mentioned at that time of my having the copy. There was nothing said at Orwigsburg to induce me to think it was material to mention it. Mr. Hoffman was present when I made the copy, and assisted to compare it. The copy was made in the prothonotary's office before I delivered the original to him. I do not know but Mr. Hoffman suggested the propriety of my taking and keeping the copies. I think when I found it I took it up to Mr. Hoffman's office and showed it to him, and then we came down to the office and the copy was made. I do not know that I said any

(Hoffman *v.* Coster.)

thing to Mr. Hoffman about the copy when at Orwigsburg, to my recollection. Mr. Hoffman paid me for my trouble in making the search and finding the paper. I think he paid me ten dollars. I did not pay it to the prothonotary; I kept it. I do not know that I ever searched for it for Mr. Hoffman before. He had inquired before, and I told him it was not there. He said he would give me ten dollars to find it. He did not say it was there; he said he supposed it might be among the papers. I do remember Mr. Tilghman being there and inquiring for this paper, and I referred him to Mr. Marx's family. I do not know that he searched himself. Some of the gentlemen of the bar, who knew the situation of the papers, go into the vault for the papers. I do not know of Mr. Hoffman being in the vault to search. Mr. Hoffman did not say the paper was in the office. He said it was likely to be there, or that it might be there. He did not say he was told by Tilghman or Leavensworth it was there. I have no recollection of making a copy of any paper delivered out of the office. It is a common thing to let papers go out. I made no search in 1834 for this paper. If any gentleman had inquired for it, I should have told him where it was. I did not search for it for Joshua W. Comly. I did not deliver it to Mr. Hoffman to keep it secret. I have made out four or five copies of the record. One or two at the request of Mr. Lœser and some at the instance of gentlemen from Philadelphia."—(Looks at a copy of a record.)—" Part of this is in my hand-writing, and part in the hand-writing of Mr. Solliday. It is certified 6th May, 1833. I have no recollection of any person waiting, but I judge we were hurried from the fact of Mr. Solliday making part of it out." *Re-examined.*—" I do not know of Mr. Hoffman ever going into the vault and searching for a paper, without inquiring for it of the officer. I always preferred the gentlemen asking for the papers."

The plaintiff then called Samuel Marx, Esquire, who, being sworn, testified—" I am the son and administrator of George Marx, deceased. Mr. Hoffman applied to me for these conditions of sale. There were no conditions of sale among my father's papers. I referred Mr. Hoffman to Reading, that they might probably be there. There was no deed found among his papers to Nathaniel R. Snowden. I made search for it." *Cross-examined.*—" The signature to the conditions of sale is in my father's hand-writing."

Whereupon the said conditions of sale, bearing date June 9th, 1810, were offered and given in evidence by the plaintiff, as follows:

" Sheriff's sale.—The conditions of this public vendue here holden the ninth day of June, A. D. 1810, at the house of Elizabeth Wood, innkeeper in the borough of Reading, Berks county, for the sale of fifty contiguous tracts of land, situate on the head waters of Schuylkill, partly in Manheim and partly in Pinegrove townships, Berks

(Hoffman *v.* Coster.)

county, containing together twenty-one thousand six hundred and forty-nine acres, one hundred and thirty-three perches and allowance of six per cent. &c., more or less, adjoining land of Thomas Reed, Jacob Graul, Michael Gunkle, Francis Umbehacker, John Wagener, Robert Martin, Esquire and others, late of the estate of John Nicholson, deceased, is such, the highest bidder to be the purchaser, the purchase-money to be paid to the subscriber, high-sheriff of Berks county, at his office in Reading on the sixth day of August next, at which time a sheriff's deed will be executed to the purchaser for said premises, agreeably to law.

.        GEORGE MARX, Sheriff."

" I hereby acknowledge to have purchased the premises above mentioned for the sum of *one hundred dollars*, in gold and silver money, and for the true performance of the above condition, I bind myself, my heirs, executors and administrators, and every of them, unto George Marx, Esquire, high-sheriff of Berks county, his executors, administrators and assigns, in the penal sum of *two hundred dollars*, in like money as aforesaid, firmly by these presents. Witness my hand and seal the ninth day of June, A. D. 1810.

Witness present at signing,    )
WM. WITMAN, Jr."               )

The plaintiff then offered in evidence a deed dated June 5th, 1832, from Nathaniel R. Snowden and wife, to Jacob Hoffman, the plaintiff, for the premises in dispute ; to the admission of which in evidence, the defendants by their counsel objected, on the ground that there was no evidence of the grantor having any interest in the premises alleged to be granted ; and the court after argument sustained the objection and rejected the evidence ; to which decision the plaintiff by his counsel excepted.

Jacob Hoffman, the plaintiff, being then sworn to make true answers, testified :—" I have made search for a deed from George Marx, Sheriff, to Nathaniel R. Snowden. I called on Samuel Marx, administrator of George Marx, deceased. I next called on General Adams, then Prothonotary of Berks county, or Solliday, but I think it was Adams, and made inquiry of him. In February 1834, I was in Franklin, Venango county, at the house of Nathaniel R. Snowden, and was there several days. I got him to search among all his papers in my presence. None of these searches were successful."

The plaintiff then gave in evidence a notice to the defendants, duly served to produce the said deed from George Marx to Nathaniel R. Snowden.

The plaintiff then again offered the testimony of the said Jacob K. Boyer in evidence to prove the existence of a deed from George Marx, Sheriff, to Nathaniel R. Snowden, for the premises in dispute. To the admission of which in evidence, the defendants by their

(Hoffman *v.* Coster.)

counsel objected; which objection was sustained by the court, and the evidence rejected; and the plaintiff by his counsel excepted.

The plaintiff then again offered in evidence the said deed of conveyance from Nathaniel R. Snowden and wife to Jacob Hoffman, the plaintiff, for the premises in question; which being over-ruled by the court, the plaintiff excepted to the decision.

The jury having found for the defendants, the plaintiff took a writ of error, and filed the fellowing exceptions :

" 1. The rejection of the testimony of Jacob K. Boyer.
2. The rejection of the deed of conveyance from Nathaniel R. Snowden and wife to Jacob Hoffman, for the premises in dispute."

The case was argued at December term last, by Mr. *Hepburn* and Mr. *Scott,* (with whom was Mr. *Porter,*) for the plaintiff in error, and by Mr. *Sergeant* and Mr. *Mallery,* (with whom was Mr. *Budd,*) for the defendants in error.

Arguments for the plaintiff in error.

1st error.   Boyer was a competent witness.   Infamy arises from the nature of the crime, and is the consequence of the judgment.   If the judgment be pardoned, the competency is restored. The crime cannot be removed by a pardon which only affects the sentence, the moral guilt still remaining ; a pardon sufficient to remove the whole punishment removes the infamy.   1 *Gilbert, Ev.* 260.   2 *St. Trials,* 269 ;  3 *St. Trials,* 585 ;  4 *St. Trials,* 610.   1 *Starkie Ev.* 79 : the words in a pardon " delivered out of prison," were held to take away the infamy, 2 *Hawk.* c. 37, sec. 49.   The king's pardon of burning in the hand, was held to restore the competency of the witness, 6 *Geo.* 4; *Tomlin's Law Dic.* 689, tit. Ev. 2 ; 1 *M'Nally Ev.* 234.   The king's pardon of the punishment takes away the infamy.   A man who has suffered the punishment is by the English statute restored to competency.   The punishment is held to accomplish its object.   Infamy is as much a part of the sentence as the imprisonment, and the one is pardoned as much as the other.   4 *Hawk.* c. 48, sec. 49.   A pardon shall be construed most strongly against the king or grantor.   1 *Chitty C. L.* 629.   When it is said that a pardon cannot be extended to a felony without mentioning it, it relates to the recital.   *Styles's Reg.* 419 : 2 *Hawk.* c. 37, sec. 8. Here the president has recited the crime.   When the king pardoned the suit, he pardoned the homicide.   3 *Coke's Ins.* 234.   *Gilbert Ev.* 140.   The executive cannot discharge from imprisonment, without pardoning the offence.   2 *Hawk.* c. 37, sec. 12.   6 *Co. Rep.* 14.   1 *Chitty's Crim. Law,* 627, note.   *U. S.* v. *Lukens,* (4 *Wash. C. C. Rep. Cox's Digest,* 510.)   The power resides in the governor as fully as in the king ; a proviso repugnant to the pardon is to be rejected. *People* v. *Pease,* (3 *Johns. Cases,* 333.)   The remission of a penalty

(Hoffman v. Coster.)

restores competency, 1 *Chitty's C. L.* 491, 617, 621. A pardon of the sentence in the spiritual court, discharges not only the sentence but its disabilities, *Cro. Charles,* 55. *King* v. *Riley,* (2 *Leach Cr. Laws,* 509,) was a special pardon, and was held to restore competency. The sentence is only the legal evidence of guilt. At common law, the pardon was only of the suit or indictment and not of the offence. 1 *Tom. Law Dic.* 681. 1 *Chitty's Crim. Law,* 490. On principle the witness ought never to have been excluded ; and the law now favours his competency, and leaves conviction to affect his credit, 5 *Am. Jurist,* 101. Does the act of Congress make the offence of which Boyer was convicted a disqualification ? The punishment does not make it a disqualification. 3 *Wash.* C. *C.* 99. There is no forfeiture of goods and chattels under that act, Why then does disqualification follow ? *U. S.* v. *Jones,* (3 *W. C. C. R.* 209.) When an act of Congress uses a technical word, the common law must be resorted to. *Russell on Crimes,* (head of Felony.) Does felony invariably disqualify ? A pardon can only be granted by the executive, and it is on a footing with a parliamentary pardon. All the executive could do was to remit the remainder of the sentence, unless the pardon was granted before conviction ; and therefore the criticism on the word *remainder,* in the pardon, is too strict for modern times. What reason is there in the 19th century against hearing the witness, and letting the jury decide on his credibility ? A conviction of a felony in one state, will not disqualify in another, nor will it where the conviction is in a foreign country, *Commonwealth* v. *Green,* (17 *Mass. Rep.* 513.) The Courts of the United States cannot execute criminal laws, unless made by Congress ; they cannot execute common law criminal laws. *U. S.* v. *Hudson and Goodwyn,* (7 *Cranch,*) *Duponceau on Jurisdiction,* 13. The inference is, that the disqualification does not follow from the conviction, unless the act of Congress expressly declares that it shall. The word *remit* is the usual word in pardons ; the pardon in this case is in a form common in Pennsylvania. 2. If Boyer was a competent witness, his evidence was admissible, either to prove that Charles Snowden purchased at the sheriff's sale in trust for his brother Nathaniel, or to show that a deed was executed to Nathaniel, and the record fraudulently altered. The parol evidence was proper to be submitted to the jury. Is this such a record as imports absolute verity? 2 *Vernon,* 547. Parol evidence was admitted against the enrolment of a deed. 10 *Johns. Rep.* 51, 53 ; *Byer* v. *Woodbury,* (1 *Pickering's Rep.* 362.) Parol evidence was admitted to prove the alteration of an execution. *Purdon's Dig.* 388, act on defacing of Records. *Ream* v. *Commonwealth,* (3 *Serg. & Rawle,* 207,) indictment for falsifying record. Had we produced a deed to N. R. Snowden, on the principle contended for here, it would have falsified the record, *Jackson* v. *Rumsey,* (3 *Johns. Cases,* 234.) *Kernes* v. *Swope,* (2 *Watts,* 79.) A registry is only *prima facie* evidence

(Hoffman *v.* Coster.)

that the original has been proved. 1 *Peters's C. C. Rep.* 188. *Nourse* v. *M'Coy*, (2 *Rawle*, 70.) *Meredith* v. *Shewell*, (1 *Penn. Rep.* 495.) Where there is an erasure on the record, it is competent to show that it was not made by the officer. *Commonwealth* v. *Blane*, (4 *Binn. Rep.* 186.) A mistake in the date of the registry of a slave, was allowed to be shown by parol. *Parker* v. *Loughborough*, (10 *Serg. & Rawle*, 249.) Parol evidence was admitted to show an alteration in an affidavit of an assessor. 16 *Serg. & Rawle*, 44. Alterations and interlineations in a deed were left to the jury to determine whether they were made before or after execution. 1 *Peters's S. C. Rep.* 552. *Kernes* v. *Townsend*, (2 *Watts*, 180.) *Hull* v. *Hamblin*, (*Id.* 354.) It is competent to impeach the judgment of another tribunal on the ground of fraud. Boyer's evidence is not to be construed as impeaching the record, if it is applicable to the case in any other point of view. It goes to complete an imperfect record. It shows what the record really was. Is a record fraudulently altered, the true record? Parol proof of alterations in records has been received, and its validity left to the decision of juries. In the case of the *King* v. *Hopper*, (3 *Price Ex. Rep.*) the alteration was made according to the truth, and the Court does not presume to say, but that a case might be made out, in which a Court of Equity would interfere. In Pennsylvania, we have the right to prove the fraud, and the party guilty of it shall not profit by his own fraud. But if this evidence is held to be inadmissible, are we not without a remedy? How can the court of Berks county set the matter right? Where is the power of that court to decide the fact with regard to the record? We are entitled to be heard by a jury upon our title, and not by a feigned issue to try that fact. How could we tell whom to bring into court? The prothonotary's entry of the sheriff's deed was regularly admitted by the Court below. *Willing* v. *Morris, et. al.* (3 *Yeates*, 104.) The mode in which it was proved is not open to discussion here, as the defendant's bill of exceptions is not before the court. The original was properly received. The acknowledgment of the sheriff's deed was good evidence to show that the title was out of the mortgagor, whether we could show that the title was in the plaintiff or not; at the time, and in the manner in which it was offered, it was legal evidence; after making search for the deed, and proving its loss, the record became strictly legal evidence.

2d error. The deed from N. R. Snowden to the plaintiff was improperly rejected, as we had shown sufficient title in the grantor to have justified its admission. The facts, that Nathaniel was the owner of the mortgage; that the suit was to his use; that an inadequate price was paid for the land; that the record had been erased; and that, in one place, the property is said to have been sold to Nathaniel, were sufficient to show that Charles bought in trust for Nathaniel. Might not the jury have presumed a trust? 1 *Rawle*, 373, a recovery may be had without a paper-title. 1 *Dall.* 72.

(Hoffman *v.* Coster.)

*Hooke* v. *Long,* (10 *Serg. & Rawle,* 1,) a spark of title is sufficient to make a grantor's deed evidence. 3 *Watts,* 95. 2 *Serg. & Rawle,* 83. *Fisher* v. *Keen,* (1 *Watts,* 278.) It was highly improbable that any plaintiff would allow land so valuable to be bought by another for so small a sum, compared to his mortgage. When a survey was found in the office, without a date, it was left to the jury to determine when it was put there. *Snyder* v. *Bowman,* (4 *Watts,* 132.) Contradictions in the record, and the various facts and inferences arising in the plaintiff's case, were for the determination of the jury, which were taken from them by the rejection of the deed from N. R. Snowden to the plaintiff.

*Arguments for the defendants in error.*

1st error. Boyer was, first, an incompetent witness, and, second, his evidence was inadmissible.

1. His incompetency proceeded from his conviction of an infamous offence, which was made felony by an act of Congress. *Ingersoll's Dig.* 93. The President's pardon merely remits the remainder of the sentence, and orders him to be enlarged from imprisonment on the payment of costs. The President may pardon the crime, the sentence or the execution; but here he has neither pardoned the crime, the sentence, nor the execution, but only a portion of the execution. The President has no power to order a prisoner to be discharged from prison, except by granting him a pardon. A pardon of the execution is not a pardon of the crime. Infamy proceeds from the crime, and is a consequence, but not a part of the sentence, and is a punishment affixed by law. The language of the pardon shows that it was only designed to liberate him from imprisonment, on the payment of costs. Does the remission of the remainder of the imprisonment *ipso facto,* remit the infamy? The President may give a partial pardon; 3 *Johns. Cas.* 333. This is a special pardon; no general words are used. The presumption is that the form of a limited pardon was purposely selected. According to the doctrine in the Year Books, this pardon should be entirely disallowed, which is more than we ask. It is good as far as it goes, but it does not affect the infamy. The words of a general pardon are different. *Tremaine's Pleas of the Crown,* 312, tit. Pardon. *Croke Ch.* 55. *Styles' Reg.* 419. *Lilly's Abs. of Crim. Law,* 270. 1 *Kent's Com.* 462, 3. 2 *Hawk. P. C.* c. 37, sec. 12. Pardons are general and special, absolute or conditional, by the king or by parliament. 17 *Vin. Ab.* tit. Prerogative, p. 18, 23. A pardon at the suit of the party to be taken more strongly against him, but where *mero motu,* more strongly against the grantor. *Id.* p. 19, 20, 27, 31, 36. A pardon is not to be carried beyond its express purport. 5 *Wils. Bac. Abr.* 291, 2, tit. Pardon. *People* v. *James,* (2 *Caines,* 57.) The executive may limit his mercy and remit a part. *Duncan* v. *Commonwealth,* (4 *Serg. & Rawle,* 451.) The conviction being in the Circuit Court of the United States, is as

(Hoffman *v.* Coster.)

operative as if in the State Court; for, said the Chief Justice, " There can be nothing in the argument that the conviction is by a foreign tribunal. It might be good as between foreign countries." The certificates and pardons referred to are not satisfactory, nor do they aid the argument of plaintiff's counsel.

2. Boyer's evidence having been offered to impeach a record is inadmissible. The record itself was irregularly admitted. It should have been proved by an authenticated copy, and not by leaving to the jury the power of determining on the authenticity of the original, which belonged to another court. The prothonotary's docket, at great risk, and without giving the court an opportunity under its seal, of determining whether it was right or not, was carried to Northampton county. If the Court of Berks county held it to be right, how can it be wrong? Different courts and juries might disagree, and thus the greatest confusion would be produced. At least it was but secondary evidence. When regularly admitted, it is only evidence of the contents, after proof of the existence and loss of the original. *Lodge* v. *Berrian*, (16 *Serg. & Rawle*, 297.) 4 *Watts*, 396. The plaintiff gave notice to produce a deed to N. R. Snowden, which never existed; had he called for the deed actually executed to Charles Snowden, we could have produced it. The plaintiff produced the record, and then endeavoured to falsify it; as he produced it, he was bound by it. The prothonotary's entry is a record so far as it records the act of the court, but no further. The statement of land being sold to N. R. Snowden is mere impertinence, and ought not to be there. That entry is not essential to a purchaser's title. There is no law which requires a purchaser to examine the records, or prohibits him from relying on an authenticated copy. Where there is a sheriff's deed that is sufficient. The law fixes the place of keeping records, and the manner of authentication. There is a responsible officer, and a court to take care of them. *Voris* v. *Smith*, (13 *Serg. & Rawle*, 334.) *Edmiston* v. *Swartz*, (*Id.* 135.) In case of a conviction for altering a record, the court that keeps it can alone correct any error in it. Can an original record be brought into another court to be corrected? The court which keeps the record will, when an application is made in a proper time and manner, grant a remedy. The erasure in the record, so far from importing any thing derogatory, implies when of long standing, that the court ordered it to be done. The court has power to judge of its own acts, and of the record of its acts. The great lapse of time, during which this record has remained unquestioned, sustains its integrity. Parol evidence cannot be admitted to impeach it. It imports absolute verity. Reason and authority sustain this position. *Adams* v. *Betz*, (1 *Watts*, 425-7.) *King* v. *Hopper*, (3 *Price's Ex. Rep.* 495.) 3 *Starkie*, 1020. *Sidwell* v. *Evans*, (1 *Penn. Rep.* 383.) *Shriver* v. *Commonwealth*, (2 *Rawle*, 207.) 14 *Serg. & Rawle*, 173. 2 *Rawle*,

(Hoffman v. Coster.)

163. *Selin* v. *Snyder*, (7 *Serg. & Rawle*, 171.) *McPherson* v. *Cunliff*, (11 *Serg. & Rawle*, 437.) 1 *Penn. Rep.* 493. *Croswell* v. *Byrnes*, (9 *Johns. Rep.* 287.) 2 *Penn. Black.* 382, 3. *Dickson* v. *Fisher*, (1 *Black. Rep.* 664), where it was said that a record shall always be deemed to have been in the same plight in which it is found. 7 *Comyn's Dig.* 206-8, title Record, A. B. C. 1 *Comyn's Dig.* 583, tit. Amendment. [D. 4.] *Id.* 607. [T. 6.] 3 *Starkie*, 1019, part 4. Great practical inconvenience and injury would result from allowing records to be contested in collateral proceedings, and from allowing their authenticity to be questioned after great lapse of time. The erasure having been made by the prothonotary's clerk, must be presumed to be right. Purchasers would have no security were the law different.

2d error. [The Court said, that if the parol evidence was rejected, there could be nothing in the second error assigned; for that, without that evidence, there did not appear that any title was shown to have been in N. R. Snowden.]

THE COURT having ordered an argument upon the point, whether, supposing Boyer to have been a competent witness, his testimony was admissible to prove that Charles Snowden purchased at the sheriff's sale, in trust for his brother Nathaniel, the question was accordingly argued at this term, by Mr. *Sergeant* for the defendants, and Mr. *Porter* for the plaintiff in error.

*For the defendants.* There are two points for consideration: 1. Whether parol evidence is admissible to raise a trust; and, 2. Whether the evidence offered in this case was sufficient for that purpose.

A resulting trust, or trust by the operation of law, is purely a question of law for the court to decide. If parol evidence be admitted, it makes a question for the jury, and not for the court. There is a distinction between a parol declaration of a trust, and parol evidence of a trust. A writing commonly exists between the parties, which is evidence of the contract. The resulting trust is created by operation of law, independent of all agreement. The case of an assignment for the payment of debts, and the debts all paid, is an example. The facts from which a trust may result, can be proved by any kind of evidence. There is no evidence in this case of any contract, or of any fact from which a trust could result, but merely an offer to show the declaration of the intentions of the purchaser at the sheriff's sale, without contract or consideration, to render them binding. The evidence should have a broader foundation to rest upon, before it can have any legal operation. 1 *Dall.* 193. 3 *Binn.* 302. 2 *Serg. & Rawle*, 521. *Peebles* v. *Reading*, (8 *Serg. & Rawle*, 492.) *Wither's Appeal*, (14 *Serg. & Rawle*, 185.) *Gratz* v. *Gratz*, (4 *Rawle*, 434.) Our act is the same as the English statute

(Hoffman v. Coster.)

of frauds, and applies to equitable, as well as to legal estates. *Gib-blehouse* v. *Stong*, (3 *Rawle*, 437.) 4 *Yeates*, 280. The declarations of a grantor, after the execution of a deed, that he paid nothing for it, are inadmissible. The act of assembly says, that no leases, estates or interests in lands, &c., shall be assigned, granted or surrendered, unless it be by deed or note in writing, signed by the parties, or by act and operation of law. The reason, if there is any difference, is stronger with regard to equitable, than legal estates. The great mass of titles is by warrant and survey. Parol contracts for land, held in that manner, would be good, and not so, when the legal title was obtained by patent. Pre-existing trusts seem to be conceded by the authorities, to procure the execution of which, parol proof has been admitted. Is there in this case any resulting trust? If there be, what did it result from? There is no evidence that N. R. Snowden paid the purchase money. The lapse of time is alone sufficient to defeat it, twenty-four years having elapsed since the conversation offered in evidence, and the institution of this suit. In the case of *Peebles* v. *Reading*, Judge DUNCAN decided that fourteen years was too long. The evidence was inadmissible at the time it was offered. The plaintiff did not show that the legal title was in Charles Snowden, nor possession in him, nor that the defendants claimed under him. He, on the contrary, denied the title of Charles Snowden, and offered the testimony of Boyer to prove that the legal title was in N. R. Snowden. To admit it as evidence of a trust, would be to suppose a case inconsistent with the plaintiff's hertofore alleged title. As our case had not been opened, the nature of our title did not appear. The argument as to the value of the land is founded on erroneous estimates. The position of the parties prior to the sheriff's sale in 1810, furnishes no support to the plaintiff's case. There were other lands in Northampton county included in the mortgage. If the plaintiff expected to recover on the ground of trust, he should have proved its existence; but he evidently claimed the legal title, and has failed as to both.

*For the plaintiff.* It must be taken for granted that the defendants claimed under Charles Snowden. If Boyer's testimony be admissible in any one point, it ought to go to the jury. It was twice offered in evidence, generally in the first place, and then to prove the existence of a deed to N. R. Snowden. The question as to the order of time cannot now be started. We say that the trust appears in the conditions of sale, and in the prothonotary's record, which are consistent with the evidence of fraud. The legislature has adopted parol contracts in cases of decedents. Major Snowden was agent before the sale. The mortgage was the consideration of the sheriff's sale. Parol evidence was admissible to show that fact. Ownership of the mortgage, declarati ns at the sale, and mutilation of the record, showed the trust. In *Wallace* v. *Duf-*

*field*, (2 *Serg. & Rawle*, 521,) evidence was received after a lapse of thirty-two years. It is not necessary to create a resulting trust, that money should be paid; any consideration will do. *Church* v. *Church*, (4 *Yeates*, 280.) If $8,000 or $10,000 would have been bid, but for the declaration that it would be bid to the amount of the mortgage, then the mortgage was the consideration. A court of chancery would decree a specific performance of a contract, on proof of Charles Snowden's declarations. *Brown* v. *Isinger*, (1 *Rawle*, 408.) 1 *Penn. Rep.* 389. 4 *Johns. Rep.* 118. 1 *Johns. Ch. Rep.* 397. 4 *Dessaussure's Ch. Rep.* 651. 4 *Dall.* 218. 1 *Dall.* 426. What took place at the time of the sale, has always been given in evidence to prove fraud or trust. *Stewart* v. *Brown*, (2 *Serg. & Rawle*, 461.)

The opinion of the court was delivered by

SERGEANT, J.—The first question in this case is, as to the effect of the pardon; whether it removes the incompetency which by law attaches to the offence, and the conviction and sentence thereon. It recites the conviction, and that the sentence was to three years' imprisonment, and then remits the remainder of the said sentence, on payment of costs. The remainder of the sentence embraces all except that which had been executed, as well what is expressed in the pardon itself, as the legal consequences that flow from it. A remission of the whole sentence could do no more, since it could not undo what had been done. One of the consequences resulting from the sentence', was the disability of the party to be sworn as a witness; and when all the sentence is removed, together with the consequences of the sentence, except what had been suffered, this disability is removed. It cannot exist separate from the source from which it is derived. As to the language of the pardon, it does not appear that any particular language or form of words is necessary in such an instrument. In some of the ancient pardons, a variety of language is to be found; such as acquit, pardon, release, and exonerate. 3 *Co. Inst.* 234. In others, only the word pardon. *Ib.* 235. In the forms used by the executive of Pennsylvania, the word remit, is employed; and also, it would seem, in those given by the executive of the United States. Nor is it, we conceive, necessary to remit the crime or offence, though that is also often done in the English forms. Our practice is to recite the offence, and conviction and sentence, and then remit the sentence. And as it is by the sentence the disability attaches, as one of its consequences, this form would seem appropriate. In 3 *Co. Inst.* 235, it appears that the king's remitting the indictment, before conviction, pardoned the offence: a *fortiori* after sentence, remitting the sentence, pardons the offence. The case of the *United States* v. *Lukens*, cited in the Notes to the edition of *Chitty's Criminal Law of* 1836, p. 770, has

been referred to as resembling the present. But there only part of the sentence was remitted, namely, the fine. It did not remit the sentence, or the remainder of the sentence—that remained with all its consequences, except that the fine was forgiven. We are therefore of opinion that Boyer was a competent witness.

This opinion renders it necessary to determine the other question which has been argued—whether parol evidence was admissible to show, that the acknowledgment was originally of a sheriff's deed to Nathaniel R. Snowden, and that afterwards the prothonotary's clerk, at the instance of Charles Snowden, and by collusion with him, erased the name of Nathaniel R. Snowden from the record, and wrote that of Charles Snowden in its stead.

This is certainly a serious question in this commonwealth, where from the first settlement of the province, lands have been liable to be sold on judgments and executions, and vast numbers of titles to real estate are held under sheriff's deeds. The security of such titles would be much impaired, if, after a lapse of years and in a collateral proceeding, the record of the acknowledgment is not to be conclusive, but its truth may be contested, and the fact of the acknowledgment or the authenticity of the official proceeding of the court, may be subjected to all the doubt, uncertainty and frailty of parol evidence, perhaps after the decease of the most material witnesses. For the effect of this evidence is to deny what the record asserts. The record asserts, that the acknowledgment was of a deed to Charles Snowden. The evidence goes to falsify this, and to establish that the acknowledgment was in reality of a deed to Nathaniel R. Snowden. The acknowledgment of a sheriff's deed is the official proceeding of a court of record, acting judicially in relation to the matter before it. Ordinary deeds may be acknowledged before a judge or justice of the peace, but a sheriff's deed can only be acknowledged under the supervision of a court. Till such deed is acknowledged, the legal title does not pass—the vendee cannot demand the rents or recover possession. By the act of the 6th April, 1802, the deed acknowledged is made conclusive evidence of the purchase. The jurisdiction in relation to the acknowledgment of a sheriff's deed, is accompanied by the power to set aside the sale or confirm it, to distribute the moneys paid into court, and to award issues. It is a judicial proceeding conducted with all the solemnities of a court of record, affecting matters of the highest moment, and involving, wherever the acknowledgment is received, adjudication on the validity of the sale, and the rights of the parties to the execution and the purchase. It is therefore not susceptible of being excepted from the ordinary rule, that the proceeding of a court which is by the constitution and laws, a court of record, imports absolute verity—that the record itself, or a certified copy, *sub pede sigilli*, is conclusive as to what it contains—and that no averment, plea, or proof to the contrary, shall be admitted. The

rolls, says Coke, being the records or memorials of the judges of the courts of record, impart in them such incontrollable credit and verity, as they admit of no averment, plea, or proof to the contrary: and if such a record be alleged, and it be pleaded that there is no such record, it shall be tried only by itself. And the reason hereof is apparent: for otherwise, (as old authors say and that truly,) there should never be an end of controversies—which should be inconvenient. *Co. Lit.* 260. Records import in themselves truth, and conclude all men from denying any thing appearing within the record, as antedate, &c. *Hyndes' case,* (4 *Rep.* 71.) A man may assign error, that whereas the court gave one judgment, they ought to have given another judgment; but a man cannot say that they did not give such judgment, contrary to the words of the record. *Br. Error,* pl. 140, cited *Viner's Ab.* 173; nor say that the judgment entered in the roll was not given by the justices, but entered in the rolls by the clerk—or that the jury was not sworn as the record supposes. Nor that the jurors gave other verdict than is entered on the roll—nor where the roll is that the jury gave verdict for the plaintiff, he shall not say they gave verdict for the defendant. *Bro. Ab.* cited *Ib.* He puts other cases and concludes, 'he may assign error in a thing apparent or matter of fact out of the record, but he shall not falsify the record, as it is said elsewhere, and note a diversity.' *Br. Ab.* cited *Ib.*

These elementary principles, long since become general rules and maxims of the law, are so familiar, and indeed are so obviously necessary to the certainty of title and security of property, that it appears almost superfluous to cite them, did they not apply so directly to this case. And if such averment cannot be made in error, much less can it be made in a collateral proceeding; or one court undertake to institute an inquiry on parol evidence, whether the record of another court is or is not true—whether it has been duly kept by the officer—whether it has been altered, and if altered, whether that alteration was authorized or unauthorized. Every court of record is the guardian and judge of its own records. It is clothed with full power to control and inquire into them, and to set them right, if incorrect. They are placed in the custody of an officer, who is appointed by the executive, whose duty it is to preserve them pure and regular; who is sworn to perform that duty, and required to give security; and who is at all times subject to the supervision of the court. For any criminal alteration of the record, he and all concerned, would be subject to infamous punishment, by the act of 1700, as well as to the payment of double the damage sustained. These are the precautions which the law provides for the faithful keeping of the records; and under these precautions, it gives full faith and credit to them, and will not allow their verity to be questioned. *Omnia presumuntur rite et solemniter esse acta.* The law will not, says Lord Coke, admit any proof against the vehement

(Hoffman *v.* Coster.)

and violent presumption of law, that a justice sworn to do justice well, will do no injustice. 12 *Rep.* 24.

In la'er times, our own courts and others, have repeatedly recognized this doctrine, and acted on it. In *Selin* v. *Snyder* (7 *Serg. & Rawle*, 171,) parol evidence was offered to show that Mary Kendig never had authorized the use of her name in an application to the Orphans' Court to sell real estate. Yet because by the record it appeared, that she with others, came into court, and petitioned for an order of sale, and made return of sale, the evidence was rejected. Tilghman, C. J. says, " the assertion on the record, that the parties appeared in court, must be taken for absolute verity. The truth of their records concerning matters within their jurisdiction, cannot be disputed." In *M'Pherson* v. *Cunliffe*, (11 *Serg. & Rawle*, 437,) a sale was made by order of the Orphans' Court to pay debts and support minor children of a deceased husband. After some years it turned out that the marriage was void, and the children illegitimate; yet the court held that the order of sale and decree of confirmation could not be thus impeached. Mr. Justice Duncan, in delivering the opinion of the court says, that the determination of the court in the recent case of *Selin* v. *Snyder*, restored the law by declaring that testimony shall not be received to contradict the record. In *Kennedy* v. *Wachsmuth*, (12 *Serg. & Rawle*, 171,) the Orphans' Court amended the record by adding to it the affirmation of an administrator of the amount of the intestate's debts exhibited to the court eight years before. Tilghman, C. J. says, " in considering the record before us, we now take it that the affirmation of Lewis was made previous to the order of sale—then it is all right, for the record cannot be contradicted." In *Adams* v. *Betz*, (16 *Serg. & Rawle*, 425,) it was held to be error to leave it to the jury to decide,. in a dispute between judgment creditors, at what time a judgment was entered. Mr. Justice Ross, in delivering the opinion of the court, after examining the authorities fully, says that a record found in the office, shall be intended to have been always in the same place in which it is found, and that parol evidence cannot be received to prove it wrong, though it might be admitted to prove it right. He refers to the cases cited to the contrary, and says that on examination it will be found, that the parol proof was only admitted when the record was lost or so obliterated as not to be legible. The case of *Meredith* v. *Shewell*, (1 *Penn. Rep.* 495,) where the sheriff was admitted to prove that a line drawn through his indorsement on a writ returned, was not made by him, can only be supported, it appears to me, on the ground that it was to explain an ambiguity; although even in that point of view, *Dickson* v. *Fisher*, (1 *W. Bl.* 664,) seems to be a decision the other way.

In *Garrick* v. *Williams*, (3 *Taunt.* 347,) the enrolment of a deed stood unquestionably wrong, and four years afterwards it was made right by the clerk of his own authority; yet the court would not

(Hoffman *v.* Coster.)

listen to any argument on the misconduct of the officer; the Chief Justice saying, that no averment or evidence shall be received to show that the date is incorrect. Afterwards the same case came before the Court of Chancery, and the Chancellor said, that if the record had been altered contrary to what it ought to have been, application ought to have been made to the keeper of the records to set it right. In *The King* v. *Hopper,* (3 *Price's Exchequer Reports,* 495,) this case was recognized as a strong case, and bottomed on sound authorities; and it was held, that the endorsement by the clerk of the enrolments, of the day of enrolment by way of date, is a part of the record, and cannot be averred against; nor is evidence admissible to show that it was in fact enrolled on some other day, and that, although the date be written on an erasure.

It is contended by the plaintiff, that fraud and collusion constitute an exception to the general rule, and that persons to be affected by such fraud and collusion may prove them, and thus avoid the effect of a judgment or decree otherwise binding. Here, however, it is necessary to distinguish.

The general rule is, that wherever a matter comes to be tried in a collateral way, the decree, sentence, or judgment of any other court having competent jurisdiction, shall be received as conclusive evidence of the matter so determined. That is to say, when it is legally received in evidence, such is its operation and effect—it is conclusive, and evidence is not admissible to contradict it. *Amb.* 761. It is for this reason that, in general, a verdict and judgment, or record or other judicial proceeding between other parties, is not admissible in evidence to affect strangers—because they have had no day in court to contest it, nor have they a right to bring a writ of error to reverse it. There are cases, however, in which the judgment, sentence, or record of a court adjudicating on the point before them, is admissible in evidence, in a cause between other parties. As where it is a link in a chain of title, *Burr* v. *Gratz,* (4 *Wheat.* 213); or where it is a decree or order of a court in relation to the property or matter in question before them—such as a probate of a will—a decree in relation to marriage or divorce—a decree of condemnation of goods under revenue laws—a discharge under insolvent laws—an order of sale by the Orphans' Court—a final settlement of an administration account, and others.

In such cases, if the proceeding were adversary in its character, it is ordinarily binding and cannot be controverted. It is not permitted a third person to allege that the decree, sentence or judgment of a court of competent jurisdiction was obtained by imposition, fraud or forgery, practised on the court, or by mistake, wrong or injustice. The merits cannot be thus overhaled and re-examined in a collateral proceeding. It is either not at all admissible in evidence, as to third persons, or if admissible, is conclusive as to every thing it directly decides as the matter in question—though not as to infer-

(Hoffman v. Coster.)

ences that might be drawn from it. 1 *Phill. Ev.* 242, 254. *Amb.*
761. I speak of the effect in a civil proceeding, and not in a crimi-
nal one. Thus in *Noel* v. *Wells*, (1 *Lev.* 235,) the court would not
receive evidence to prove that a will of personal property was forged
in contradiction to the probate. Evidence will not be admitted to
prove that another person was appointed executor, or that the testa-
tor was insane; for that would be to falsify the proceedings of the
ordinary, in cases where he is the exclusive judge. *Ib.* So, in *Mea-
dows* v. *The Duchess of Kingston*, the plaintiff filed a bill to set aside
a bequest by the duke to the defendant, on the ground that she
had imposed herself on him as a single woman, being previously
married. The defendant pleaded a decree in the ecclesiastical court
in her favour, in a suit by her against her first husband of jactitation
of marriage. The Lord Chancellor held it conclusive. He says,
" I lay it down as a general rule, that whenever a matter comes
to be tried in a collateral way, the decree, sentence or judgment of
any other court, having competent jurisdiction, shall be received as
conclusive evidence of the matter so determined." *Amb.* 761. 1
*Phill. Ev.* 264, 267. In *Sheets* v. *Hawke*, (14 *Serg. & Rawle*, 173,)
it was decided that the record of the discharge of an insolvent debtor
is conclusive as to the fact of his having complied with all things
required by law to entitle him to a discharge, and cannot be inquired
into in a collateral action. Parol evidence is not admissible to show
the grounds of a decree of the Court of Common Pleas. *Gallagher*
v. *Kennedy*, (2 *Rawle*, 163.) A judgment of a court of competent
jurisdiction discharging a debtor under the *Bread act*, cannot be
impeached collaterally by proof that at the time of his discharge he
had a sufficient sum of money about his person to discharge the
debt. *M'Kinney* v. *Crawford*, (8 *Serg. & Rawle*, 354.) To the same
point might be cited the cases of *Wright* v. *Deklyne*, (1 *Pet. Rep.*
20 *l.) Berks and Dauphin Turnpike Co. v. Kendel*, (11 *Serg. &
Rawle*, 123,) and indeed there would be no end of citing them. I shall
only refer to the case of *Slocum* v. *Slocum*, (3 *Cranch*, 300.) There
the court below instructed the jury that a fraud practiced by a
debtor in obtaining his discharge under the insolvent law avoided
the discharge and left his security liable for his bond not to depart
from the prison rules. But the Supreme Court of the United States
held this construction to be erroneous and reversed the judgment,
saying that the judgments of a court of competent jurisdiction,
although obtained by fraud, have never been held void, and there-
fore all acts performed under them are valid as far as respects third
persons.

The only exception to the rule which has been allowed of, when
such judgment or proceeding is given in evidence against third per-
sons, is, that they may aver and prove that such judgment or pro-
ceeding was procured or kept on foot by covin or collusion between
the parties to it; and in such case, though binding between themselves,

its operation as to third persons may be defeated. *Fermors' case,* (3 *Co.* 77,) however, where the rule is stated that all acts mixed with fraud and deceit, whether judicial or otherwise, are wrongful and unlawful, was the case of a common assurance not of an ordinary judicial proceeding. There a lessee for years levied a fine by covin with another, in order to gain the fee by the statute of *non claim;* but it was held not binding in his favour against the reversioner. Some of the cases cited there are of judicial proceedings. Thus a widow entitled to dower, by covin between her and another, caused a stranger to disseise the tenant, in order that she might bring a writ of dower against him, which she did and recovered; yet though she had a good title, the whole was considered void and of no force to bind the terre-tenant. But if the proceeding were adverse, if the party, as Lord COKE says, *venit tanquam in arena,* it is otherwise. Thus it is said in the same case, if a disseisor, (although he gains the possession by wrong,) levys a fine with proclamation, yet it shall bind the disseisee. In the *Duchess of Kingston's case,* before the House of Lords, on her indictment for bigamy, she set up a sentence in her favour in the ecclesiastical court, on a suit for jactitation of marriage, between her and her husband, but it was held that the crown, in a criminal prosecution might aver and prove that the sentence was obtained by covin and collusion between her and her husband. 1 *Phill. Ev.* 266. So in reply to a plea by an executor, of judgments recovered, a creditor may reply *per fraudem;* and a creditor affected by the lien of a former judgment may show it was obtained by covin. In all these cases, the record itself is not controverted; it is binding between the parties to the fraud; but a stranger may prevent those concerned in it from employing it to his prejudice.

But the exception does not apply to parties or privies. The record is conclusive evidence against them in a collateral proceeding; and they cannot invalidate it by giving evidence of fraud, but must apply to the court which pronounced the judgment, to vacate it. 1 *Phill. Ev.* 266. In the case of *Proudham* v. *Phillips,* cited *Ambl.* 761, the plaintiff brought assumpsit against the defendant, who gave in evidence her marriage with *Merilman.* The plaintiff then produced a sentence of the ecclesiastical court annulling this marriage, for that when solemnized, the defendant was married to Delafield. The defendant offered to prove that the sentence was obtained *per fraudem.* WILLES, C. J., after much debate, took a distinction between the case of a stranger who cannot come in and reverse the judgment, and therefore must of necessity be permitted to aver that it is fraudulent, and the case of one who is party to the proceeding. If *he* plead that the judgment was fraudulent, he cannot give evidence of it, but must apply to the court which pronounced the sentence to vacate the judgment; and if both parties colluded, it was never known that either of them could defeat it.

An action will not lie against the defendant for obtaining a decree

in chancery, by false and forged evidence ; such decree being still in force. *Peck* v. *Woodbridge*, (3 *Day*, 30.) And where an action was brought in the Supreme Court of New York against a defendant for suborning a witness to swear falsely in a cause in Connecticut, whereby judgment was given against the plaintiff, contrary to the truth and justice of the case, it was held the action would not lie. KENT, J., relied on the conclusiveness of the judgment in Connecticut, which it was attempted to open in a collateral action ; *Smith* v. *Lewis*, (3 *Johns. Rep.* 157.) In a suit on a judgment in another state, the plea that it was obtained by fraud, mistake, or want of consideration, is not admissible. *Benton* v. *Bergot*, (10 *Serg. & Rawle*, 240.)

Here Nathaniel R. Snowden was a party in the judgment, execution and proceedings, in the Court of Common Pleas of Berks county, where this acknowledgment took place. The judgment was recovered to his use; he was the plaintiff, and his remedy, if the record were fraudulently or improperly altered, was an application to that court to correct it. That court had full power to inquire into the matter by inspection of its record, by examination of its officers, by compelling the attendance of witnesses, and we must take it for granted, if they were convinced the record was improperly altered, would have amended it, provided the application were made in due season, and the rights of third persons not thereby affected. This was the proper remedy instead of an ejectment in another court, and an effort there to condemn the existing record, and create a new one by parol evidence.

There is another feature in the proposed inquiry, which is also constituted a strong objection. And that is, that according to the evidence offered, the alteration of the record was made by the prothonotary's clerk. The act of the clerk in his capacity as such, is (speaking *civiliter*,) the act of the prothonotary, who is the maker and keeper of the records, under the supervision of the court. It is then the record of the court made by the proper officer, and another court cannot say whether the record made by the proper officer, was properly made or not, whether he did right or wrong. If his conduct was criminal, he ought to be indicted and heard in his defence. If simply improper, without criminal motive, the court of which he is an officer, is the only jurisdiction that can examine this, and correct it. If different courts undertake to investigate it, they might come to different conclusions. Some might condemn it, while the court itself approved it, and adhered to it as their record. In *Br. Ab. Record*, pl. 45, 18 *Vin. Ab.* 173, there is this case : "Record of outlawry of divers persons was certified in the exchequer, among whom one was certified outlawed, and was not outlawed, and that his goods were in the hands of J. N. And upon process made against him, he came and said he was not outlawed ; and parcel of the writ came by writ of the chancery out of B. R. into the Exche-

quer; and GREEN, Justice of B. R., came into the Exchequer, and said he was not outlawed, but that it was misprision of the clerk. SKIPWITH said, though all the justices would record the contrary, .they shall not be credited when we have the record that he is out-lawed.   *Query,* what remedy is for the party ? It seems it is by writ of error, inasmuch as there is no original against *him,* but only record of outlawry without original." Now here one of the judges of the court of King's Bench, moved no doubt by the injustice of the thing, went into the Exchequer to remonstrate, and to testify that the record before them from the court of King's Bench was not true; that it was a misprision, (or criminal offence, 4 *Bl. Com.* 119,) of the clerk.   But the judges of the Exchequer would not listen .to the evidence of the judges of the King's Bench, because it was irregular and illegal, inasmuch as it went to falsify the record, which the clerk had estreated into the exchequer.   We are there-fore of opinion that the contents of the deposition of Boyer were not legal evidence in the present suit.

There was another point in this case which seemed at first to require an opinion, and that was, whether Charles Snowden was not to be deemed a trustee for Nathaniel R. Snowden.   On consi-deration, however, we are of opinion that it does not fairly arise in the case as it appeared in the Court of Common Pleas, and is now before us, owing to its being placed by the plaintiff throughout on the other ground, namely, that the deed was to Nathaniel R. Snowden, and the legal title in him.   If the plaintiff had sought to make Nathaniel *cestui que trust,* he was bound to produce the deed to Charles Snowden, or prove its contents, if lost, or not produced on notice.   The acknowledgment was not evidence, without the pre-liminary proof; and the plaintiff's case is now destitute of any legiti-mate evidence of the deed to Charles Snowden, considered in this point of view.

Judgment affirmed.