## Morris *against* Galbraith.

Mistake or fraud, committed in making up a record, can neither be averred, nor proved by parol evidence, in a collateral proceeding, nor in an action founded upon it. . The only mode of relief is through the court whose record is thus erroneous; and their record of its correction, is the true and only evidence thereof.

ERROR to the district court of *Lancaster* county.

Walter Franklin, Esq. president of the orphans' court, &c., for the use of Samuel Morris and Sarah, his wife, against James Galbraith, recognisor, with notice to Andrew Hershey, John Christ and others, terre-tenants. Debt on recognizance in the orphans' court.

The facts of this case are very fully reported in the case of Galbraith against Galbraith, 6 *Watts* 112, which was also an action of debt, brought upon the proceeding and recognizance in the orphans' court for another of the heirs of Bartram Galbraith, deceased.

*Norris* and *Jenkins*, for plaintiff in error.
*Montgomery* and *Ellmaker*, for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—The principles laid down in the case of Galbraith *v.* Galbraith, 6 *Watts* 112, and upon which it was decided, rule this case, and so it would appear the court below thought, when it came to answer the points submitted by the counsel of the defendants, and charge the jury thereon. Whether the court entertained the same opinion at the commencement and during the progress of the trial, may be questionable; otherwise it ought not to have admitted the evidence which was given on the part of the plaintiffs, with a view to change the legal effect of the finding of the inquest, as to the value of the land, after it had been approved and confirmed by the orphans' court, and taken by one of the heirs of the intestate under a decree of the same. The counsel, however, for the plaintiff, it seems, have not been able to bring themselves to think so, or else hoping that they might be able to convince this court that they had misapprehended the law in Galbraith *v.* Galbraith, have brought

[Morris v. Galbraith.]

this writ of error to have the opinion of the court below, and the whole matter, out of which the controversy has arisen, reviewed. It may be proper to state that the case of Galbraith *v.* Galbraith was not settled without great deliberation, and not until after a good deal of discussion was had among those of us who sat on the argument of the cause;* and that we did not suppose that, after having been so considered and decided, the same question would have been brought again before us, as a moot case. We have, however, only to say, that, after having given a patient hearing, and a full and deliberate consideration to the arguments of the counsel for the plaintiffs in error we can perceive no reason whatever for changing, in any respect, the opinion expressed in Galbraith *v.* Galbraith, nor any material difference, in principle, between that case and this; they run *quatuor pedibus* with each other.

The parol evidence given on the trial of this cause, by the plaintiffs, as is alleged by their counsel, for the purpose of explaining the record of the orphans' court, containing the appraisement of the land, went clearly to render it altogether different from its natural purport, according to the face of the record. But this is wholly inadmissible, for not only must the record, in such case, be proved to exist, either by adducing the record itself, or a copy thereof properly authenticated, but its tenour and effect must be determined by the court, by inspecting it when produced. "The records or memorials of the judges of the courts of record," says Lord Coke, "import in them such incontrollable credit and verity, as they admit no averment, plea, or proof to the contrary. And if such a record be alleged, and it be pleaded that there is no such record, it shall be tried only by itself; and the reason is apparent, for otherwise (as our old authors say, and that truly) there should never be any end of controversy, which would be inconvenient." 1 *Inst.* 260; see, also, Hoffman *v.* Coster, 2 *Wharton Rep.* 269 *et seq.*, where the law is very fully and accurately laid down and explained by Mr Justice Sergeant, as also most of the leading authorities referred to on the subject; so in conformity to the rule as laid down by Lord Coke, and as it has been ever held, the Supreme Court of New-York, in Croswell *v.* Barnes, 9 *Johns. Rep.* 287, where the existence of a judgment was put in issue, and the affirmative of it being established by the exhibition of the record thereof, held, that a rule of the court setting the judgment aside for irregularity, which was entered only on the minutes, without being enrolled or made part of the record, could not be received in evidence against the record of the judgment, the maxim being, in such case, *nihil tam naturale quam quidlibet dissolvi eo modo quo ligatur. Jenk. Cent.* 120. Seeing, then, that the parol evidence went to show that the tract of land actually contained two hundred and forty-three acres, instead of two hundred acres as

* Gibson, C. J. did not sit, being related to the parties.

found by the inquest, and as the plaintiffs claimed from it, to have sixty dollars per acre for the additional number of acres, the necessary effect of it would have been, if allowed, to have increased and varied most materially the valuation or aggregate price of the land from that set upon it by the inquest; it is therefore clear, and can admit of no doubt whatever, that it ought not to have been received by the court, and been permitted to go the jury; but the court having admitted it improperly, was certainly right in trying to correct its own error in this respect, by instructing the jury, in effect, to disregard it, by telling them that their verdict ought to be in favour of Andrew Hershey, the terre-tenant.

It is doubtless true, as appears from the authorities cited, and certainly justice and equity require that it should be so, that parol evidence be received to show some imperfection arising either from ignorance, mistake or fraud, committed in reducing the agreements of the parties to writing, on the trial of suits founded upon them, or drawing even collaterally in question the validity or true meaning of them, for the purpose of having them corrected or reformed, according to what was the intention of the parties, or set aside for the fraud; and that juries in such actions, where the evidence clearly and satisfactorily proves the mistake or omission complained of, are bound under the advice of the courts to reform the agreement so as to correct the mistake or omission, and thus give effect to what shall appear to have been the intent and meaning of the parties; or in case of the evidence showing clearly that a fraud was practised either in obtaining the agreement, or in reducing it to writing, when fairly made, to give such verdict as will, at least, prevent the party committing the fraud, or for whose benefit it may have been committed, from gaining any thing by it, or the party against whom it has been practised from losing thereby; and that courts of chancery have interfered and granted relief in such cases, cannot be questioned or denied. But then has it ever been heard or known, that evidence for a like purpose has been received and acted upon, either in a court of law or equity, in regard to a matter of record? Certainly no authority or even *dictum* to this effect has been adduced; and if it had, it is manifest that it would be in direct contradiction to the whole tenor of the law, as well as the uniform current of the authorities on the subject. If a mistake or a fraud be committed in making up the record, it can neither be averred nor proved in a collateral proceeding, nor in an action founded upon it. The record must be received as absolute verity and speak for itself. If wrong, the only mode of having it corrected or set right, is by an application to the court, where the proceeding or judgment was had, of which the record is a memorial, to have it reformed according to the truth, or vacated as may be requisite, of which a record must be made, which when done will be receivable as evidence thereof afterwards, according to the maxim repeated above: *nihil tam naturale quam quidlibet dissolvi eo modo quo ligatur;*

and in no other manner can a party, or privy to the judgment or proceeding be relieved, as I apprehend, in any case. See Hoffman *v.* Coster, 2 *Whart.* 474, 475.

In the case of a *scire facias* upon a recognizance, with a condition for the performance of an award to be made under a submission of *all property and interest in* K, &c., *ita quod,* &c.; the award however purporting on its face to be of *Brakes* only in K., it was held, notwithstanding the arbitrators intended, as it was alleged, to award the *place* or *property* itself, and not the *profit* out of it merely, that it could not be amended in pleading by an *averment declaring their intent.* The suit here is also a *scire facias* upon a recognizance, conditioned for the performance of a decree of an orphans' court, a court of record, too, founded upon a judicial proceeding had in the same court, by means of a jury, fixing a certain appraisement or price upon a tract of land, in which the parties here with others had an interest and were privies thereto, of which a record was made by the court; and the attempt is to show by *averment* and *parol evidence* that the jury or inquest intended to make the appraisement different from what they reported to the court, and to make the amount of it depend upon the precise number of acres contained in the tract of land, to be ascertained by a future and accurate admeasurement thereof, by an artist to be employed by the parties, as they agreed they would do, in some way or other for that purpose. But how much more veritable and conclusive was the appraisement here, being a matter of record, and equivalent to a judgment of a court of record, than the award of arbitrators in the case just mentioned; and how infinitely more dangerous would it not be to permit it to be contradicted or altered, even in a single tittle, upon the trial of a suit, founded upon it, by parol evidence especially, or indeed by any other evidence than that of the same high character with itself. If this had been a *scire facias,* upon a judgment obtained upon the verdict of a jury, or an inquisition under a writ of inquiry of damages, assessing the amount thereof in favour of the plaintiff, in the court of common pleas, it is scarcely conceivable that it would have entered into the mind of any gentleman of the profession, much less have been seriously contended, that the plaintiff could entitle himself to an award of execution for a larger sum of money than that found by the jury in their verdict, or by the inquest in their inquisition, for which judgment had been rendered by the court in his favour, by introducing an averment into his writ of *scire facias,* or his declaration, and supporting it by parol evidence, that the jury or the inquest intended it; yet in principle it would be this very case; or that the defendant could be permitted to defend against paying any part of the amount of the judgment by a plea averring, and proof showing, that the jury or the inquest either had found, or intended to find, a less sum than that which appeared on the record against him. But even supposing the inquest here had reported to the

VIII.—P*

court, in their inquisition, as is alleged that they intended, it would have been obnoxious to a fatal objection, which is, that of being void for incertitude. For they, and they alone, were to make the appraisement, and could not delegate to the court, or to any person or persons whomsoever, the future execution of any portion of the power devolved by law upon them, which was requisite to render and make the appraisement complete and certain. If, therefore, they conceived it necessary or best, in order to make a just and fair appraisement of the land, to set a certain price per acre upon it, and that the precise number of acres contained in the tract, should be ascertained by a survey thereof, or other means, with a view to calculate the aggregate of the price from such data, it was competent to them to employ an artist for this purpose; but then what he should do in this respect could amount to nothing, unless approved of and adopted by them, for they were to judge of the correctness of his work, and upon being satisfied that it was so, to make it their own by reporting the number of acres in conformity to it. But they could not leave this to be done by the parties, though they agreed to do it; and without stating either the number of acres believed by them to be contained in the tract of land, as well as the price per acre, in express terms in their report, or otherwise, the aggregate of the appraisement made by them, it would be impossible to determine from the face of the report, *per se*, the amount of the appraisement; yet this was the very thing which they, under the act of assembly, were appointed to perform and required to do, and which could not be done or supplied by the court, or any one else, either in part or in whole; so that, had the price per acre been given by the inquest without stating the number of acres contained in the tract of land, it would have been the duty of the court, seeing it had no power to amend or supply the defect, to have set the inquisition aside, as being void for uncertainty; and then to have awarded a new writ of valuation and partition. It therefore follows of course that what the orphans' court did in October, 1813, in changing the finding of the inquest, was extrajudicial, without authority and void. And what seems to render it still worse is, that it does not appear *from the record*, to have been effected after any previous notice given to all the persons concerned, that such action would be had in the case, unless cause were shown against it.

It is perfectly clear, therefore, that the recognizance upon which this suit was brought, must be regarded as conditioned for the payment of 12,000 dollars only, to and among the heirs in their respective proportions; 8000 dollars thereof, with interest thereon, within twelve months from that date, the interest on the remaining 4000 dollars to the widow during her life; and immediately upon her decease, the principal to and among the heirs in their proper proportions. Hence the land, whatever sum beyond this James Galbraith may, after it was decreed to him, have sold it for, could not be bound for the payment of more to the heirs; consequently,

if the plaintiffs have received their proportion of, or fairly released their claim to the eight thousand dollars, the land being held and owned now by those who derive their title thereto by purchase from Galbraith, must be considered as discharged from all claim by the plaintiffs under the recognizance, until after the death of the widow, when it may be liable for the 4000 dollars, however willing James Galbraith may be to give them a judgment for what they ask or claim.

But it appears that Gen. Forster, on the 22d of August 1810, then guardian of the person and estate of Mrs Morris, one of the plaintiffs, she being at that time unmarried and in her minority, received 800 dollars, with the interest due thereon, in full discharge of her proportion of the 8000 dollars, from James Galbraith, and gave a release under his hand and seal, not only acquitting the said James, but releasing and discharging the land from all claim and liability thereafter for and on account thereof. On the argument, I understood it to be admitted by the counsel for the plaintiffs, that this release was good against any right or claim they or either of them ever had to the 8000 dollars; and since we are of opinion, that this sum was the two-thirds of the appraisement of the land, according to the finding of the inquest, which was approved of and confirmed by the orphans' court, and can not be changed or altered by any averment and proof to the contrary, it would seem to be unnecessary to say more of the release. There is certainly, however, no colour or pretence for saying that it was not fairly obtained. The bond taken by Gen. Forster, at the time of his giving the release, from John Pedan and Hugh Wilson, shows that he was acquainted then with the fact that some of the other heirs, at least, of Bartram Galbraith, claimed to charge James Galbraith with more than the 12,000 dollars as the full appraisement of the land, and that a dispute had arisen between him and them in respect to it; and from the bond itself it further appears, that it was taken for the very purpose of securing to his wards their proportion of any further sum than the 12,000 dollars, which James Galbraith should be held liable to pay to them for the land.

It is sufficient, then, in conclusion, to observe, that if any exception taken in this case, has been passed over without notice above, a full and complete answer will be found to it in Galbraith *v.* Galbraith, already mentioned. And as the plaintiffs here gave no admissible evidence of any claim upon their part, but record evidence, which spoke for itself, and could not be varied or contradicted; and as the whole of the claim proved thereby was fully met by the release given in evidence by the defendant, the execution and delivery of which was not denied, and the construction thereof was a question of law for the court to decide, there does not appear to have been any controverted fact involved in the issue, which the court could have taken from the jury. We, therefore, think the

court was right in directing the jury to give their verdict for the defendant.

Judgment affirmed.